RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM D. GLUCK,

    Plaintiff,

v.

STEPHEN W. FILLO, WARBURG PINCUS LLC,
WARBURG PINCUS CAPITAL CORP, and WARBURG
PINCUS & CO.

    Defendants.

Civil Action No:

# 05 - 10659 EFH

MAGISTRATE JUDGE _____

## VERIFIED COMPLAINT

### Parties

1.    Plaintiff William D. Gluck ("Gluck") is a resident of Concord, Massachusetts. From 1983 to 1987 Gluck was a resident of Avon, Connecticut.

2.    Defendant Warburg Pincus LLC (formerly E.M. Warburg, Pincus & Co., Inc.), ("WP LLC") is incorporated in the State of New York with its headquarters located at 466 Lexington Ave. New York, NY 10017 and is a leading global private equity investment firm.

3.    Defendant Warburg Pincus Capital Corp, with its headquarters co-located with E.M. Warburg, Pincus & Co., Inc., was the entity that actually invested in Nova. This entity was managed by E.M. Warburg, Pincus & Co., Inc.

1

4.    Defendant Warburg Pincus & Co. with its headquarters located at 466 Lexington Ave. New York, NY 10017, on information and belief, owns Warbug Pincus LLC .

5.    All of the entities set forth in paragraphs 2, 3, and 4 will be referred to collectively as Warburg.

6.    Defendant Stephen W. Fillo ("Fillo") is, on information and belief, now a resident of Princeton, New Jersey and was a Managing Director of Warburg until, on information and belief, approximately 1988.    Fillo was an alumnus of McKinsey and Company's New York office.

7.    As a Managing Director of Warburg, Mr. Fillo had the legal authority to bind Warburg and Warburg is legally responsible for his actions.

### Facts

8.    Nova Robotics, Inc., (Nova) a developer, manufacturer, and marketer of robots headquartered in East Hartford, Connecticut, was founded in 1981 and liquidated in 1984.  In 1983, Nova was at an early stage in its planned development.

9.    Prior to 1980, Warburg had raised one venture fund, EMW Ventures, Inc., in 1971, in the amount of $41 million.  In the early 1980s Warburg embarked on a multi-year program to raise an unprecedented amount of venture capital.  To succeed in that larger endeavor, Warburg needed to demonstrate continued exceptional strengths in venture investment selection and analysis.

10.    Warburg's capital-raising program was successful.  Warburg raised i) Warburg, Pincus Capital Corp., a $101 million fund, in 1980, ii) Warburg, Pincus Capital

Partners, L.P., a $341 million fund, in 1983, and iii) Warburg Pincus Capital Company, L.P., a $1.2 billion fund, in 1986. On information and belief, the 1986 fund accounted for more than 30% of all the venture capital raised in the United States that year.

11.     In 1983 the field of robotics was drawing a great deal of attention in the popular and business press and in venture capital. In 1983, Warburg invested approximately $1 million in Nova. From that time on, Warburg served as Nova's lead venture capital investor and held one or more seats on Nova's board of directors.

12.     Concurrent with its initial equity investment in 1983, Warburg recruited Gluck to be president and chief operating officer of Nova.

13.     McKinsey & Company is a leading global management consulting firm headquartered in New York, New York.

14.     Gluck spent seven years in McKinsey's Chicago office, longer than most of the select professionals who flow through that firm. That stint, together with his four years in senior executive roles with two major McKinsey client organizations in the Midwest, accounted for eleven of his twelve post-Harvard-MBA career years before joining Nova.

15.     Through his work prior to Nova, Gluck had built a reputation for integrity, for distinctive skills in analysis, planning and problem-solving, for a hard-nosed approach to business challenges, and for getting results in complex and demanding business situations.

16.     McKinsey alumni hold many positions of influence worldwide in consulting, finance, industry, and executive search. There are also robust ties among

3

alumni and active firm members. The McKinsey community is a fertile source of business opportunities for its members.

17.    Warburg and Fillo, as the lead investor in Nova, recruited Gluck to Nova in order to benefit from his general business skills.

18.    Nova was a badly flawed venture investment. Fillo and Warburg had been wrong about the strength of Nova's underlying hardware technology and as a result Fillo and Warburg had been wrong about the marketability of Nova's flagship product, wrong about the prospects for the company's longer term strategy, and wrong about the magnitude of Nova's capital requirements.

19.    Nova's business crisis centered on gross performance deficiencies in the company's flagship Laserobot product. The performance deficiencies stemmed from the Laserobot's accuracy and vibration characteristics.

20.    Soon after joining Nova, Gluck discovered a technical consultant's report that had identified and documented the vibration problem. Although the technical consultant's report had been prepared a year prior to Warburg's initial investment, the report had not been discovered by Fillo and Warburg in the course of their due diligence.

21.    Within weeks of Warburg's investment, Nova's only known customer, Control Laser Corporation, informed Nova that it would be necessary to delay indefinitely the purchase of laser robots to which it had committed. The circumstances suggested yet another example of poor due diligence by Fillo and Warburg. Nova had shipped the first unit to the customer prior to Warburg, Pincus' investment. However, Nova had neglected to carry out conventional testing prior to shipment, and, according to Control Laser, other priorities precluded Control Laser's staff from carrying out any testing of their own.

27.    In the weeks following, Fillo and Warburg went along with the Founder/CEO's decision to remove Gluck as COO of Nova based on trumped-up concerns about Gluck's management performance.  The CEO had promoted Gluck to greater management responsibilities just weeks prior to his allegation, after 8 months working together.

28.    It was clear to the Warburg team that in light of the role that Gluck had played in conceiving, championing, and leading Nova's transformation, Nova's financing effort, and therefore Nova itself, would almost certainly have failed if Gluck had left the company. That failure would have been highly visible and could have exposed the Warburg team's many errors.  Therefore, it would likely have threatened Warburg's ongoing fund-raising program.

29.    In order to entice Gluck to step aside as COO and remain with Nova in a reduced capacity, the Warburg team, through the consultant that they had introduced into the matter, assured Gluck that they would sort out and air the facts of Nova at a later and calmer time lest Gluck be harmed by the attack on his capabilities and performance and by his acquiescence in a reduction in his executive duties.

30.    With that commitment secured, Gluck continued with the company in a reduced role and worked to make the company successful.

31.    Eventually, Nova failed as a commercial venture.  A joint venture partner determined that Nova and its CEO had misrepresented its software and wanted out of the deal. In the Spring of 1984, Nova filed Chapter VII and was promptly liquidated.

32.    After Nova had failed, Gluck sought to have the Warburg team deliver on its promise to air the facts of Nova so that Gluck could successfully move on.  Mr. Fillo

6

declined to do that, apparently because the facts of Mr. Fillo's performance, and that of

his team, would have proved embarrassing to Warbug and impeded his firm's ongoing

fund-raising program.  Warburg refused to honor Gluck's requests that it clear the record

with the venture capitalists who had observed Nova's final days.  As a result, following

Nova's failure, Gluck was unable to secure an appropriate permanent position in any field

-- consulting, management, or venture capital.

33.    In 1986, as a result of continuing pressure from Gluck, Fillo, Warburg and

Gluck carried out a process to resolve the matter.  Warburg and Gluck set out jointly to

set the record straight so that Gluck could move on with his career.


## 1986 "Set the Record Straight" Letter Agreement on What Had Happened at Nova

34.    The essential facts of the matter were agreed to between Fillo and Gluck

on May 6, 1986, in the only face to face discussion that they had in the course of the 1986

process.  At that meeting, Fillo generally agreed to the first four points of Exhibit A.

35.    Finally, on July 2, 1986, Fillo and Warburg issued its "Set the Record

Straight" Letter Agreement, attached as Exhibit B.   Gluck accepted the "Set the Record

Straight" Letter Agreement in his letter to Warburg of July 8, 1986, attached as Exhibit C,

conditioned on Fillo's earlier agreement to certain facts set forth in Exhibit A. .

36.    Gluck's career never recovered from Warburg's and Fillo's actions and

from the failure of Nova Robotics.  Gluck believed that Fillo had carried out the 1986

settlement process in good faith and had honored the resultant agreement.  Until 2003,

Gluck attributed his inability ever again to secure a suitable position to his belief that

7

Warburg's action in 1986, although carried out in good faith, had been "too little, too late".

37.    In 2003, Gluck learned for the first time that at or following the time of Nova's failure, Steve Fillo had had separate conversations with Ron Daniel, the Managing Partner of McKinsey (Gluck's former employer) from 1976 to 1988 and a senior partner continuing to this day, and with Fred Gluck, (the plaintiff's older brother, a senior partner of McKinsey from about 1976 to about 1995 and the Managing Partner of McKinsey from 1988 to 1994). In these meetings, Fillo criticized the job performance of Gluck at Nova. In discussion with Daniel, Fillo also dismissed Gluck's claim that Nova had been materially misrepresented to Warburg, Fillo, and Gluck. Both the allegation of poor performance and the denial of the material misrepresentation were at odds with the "Set the Record Straight" Letter Agreement.

38.    Fillo and Warburg successfully concealed their defamatory comments to Daniel and Fred Gluck from Gluck, apparently by binding them each to confidentiality and by alleging a privilege. Gluck first learned of the conversations and the disparaging comments in April 2003.

39.    In binding Daniel and Fred Gluck to confidentiality, Fillo and Warburg both intentionally concealed from Gluck the defamatory statements made by Fillo and stopped Gluck from filing a lawsuit against Warburg and Fillo.

40.    Gluck had no prior knowledge of any such disparaging comments by Fillo about his performance at Nova, or of Fillo's denial of the initial material misrepresentation, to anyone.

41.    In a letter to Gluck dated September 2, 1992, Fillo said this: "Nova collapsed because of its own weaknesses; and only then, after Herculean efforts by all of us, including you, to save it or sell it". This was consistent with "Set the Record Straight" Letter Agreement.

42.    Fillo went on to say: ".... neither I nor anyone I am aware of ever discredited you following Nova's demise". This was consistent with "Set the Record Straight" Letter Agreement.

## **Economic and Career Damages**

43.    Following the Nova debacle, despite his continuing efforts, Gluck was never again able to land a position consistent with his background and capabilities. The loss of his career deprived him of substantial income and wealth, detailed and calculated in the attached Exhibit D to be more than $20 million.

## **COUNT I**

## **DEFAMATION**

44.    Plaintiff restates the previous allegations in paragraphs 1 to 43 and incorporates them as if repeated herein.

45     By their actions defendants Fillo and Warbug defamed plaintiff Gluck.

46.    As a result of the defamation by Fillo and Warburg, Gluck was harmed in an amount that exceeds Twenty Million Dollars.

9

## COUNT II

## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS RELATIONSHIPS

47.    Plaintiff restates the previous allegations in paragraphs 1 to 43 and incorporates them as if repeated herein.

48.    Fillo and Warburg had actual knowledge that Gluck's previously positive reputation within the McKinsey community, including its alumni, was a key career asset and expectancy for future business success and that there was a reasonable probability that he would obtain an appropriate new career position in or through that community using his McKinsey connections absent their tortious actions.

49.    Through the 1980s and 1990s, a significant number of McKinsey alumni took positions in the venture investing community, including the corporate-sponsored venture investing community, and Warburg and Fillo also knew that Gluck's achievements at Nova, together with his McKinsey and earlier background, made him a strong candidate for a career directly related to venture capital, and that Gluck aspired to such a career.

50.    By their improper conduct defendants Fillo and Warburg tortiously interfered with Gluck's advantageous relationships within the McKinsey community by engaging in misrepresentation of what had actually happened at Nova and by acting maliciously towards Gluck.

51.    By their actions the defendants displayed a reckless indifference to the rights of Gluck and committed an intentional or wanton violation of Gluck's rights.

10

52    As a result of the tortious interference with his advantageous relationships, Gluck was harmed in an amount exceeding Twenty Million Dollars.

## COUNT III

### BREACH OF CONTRACT

53.    Plaintiff restates the previous allegations in paragraphs 1 to 43 and incorporates them as if repeated herein.

54.    By their actions defendants Fillo and Warburg breached the "Set the Record Straight" Letter Agreement with Gluck.

55.    As a result of the breach, plaintiff Gluck was harmed in an amount exceeding Twenty Million Dollars.

## COUNT IV

### FRAUDULENT INDUCEMENT

56.    Plaintiff restates the previous allegations in paragraphs 1 to 43 and incorporates them as if repeated herein.

57.    The defendants induced Gluck to agree to the "Set the Record Straight" Letter Agreement based on the fact that the defendants after the failure of Nova had not told others and did not intend to tell others that Gluck was in any way to blame for the failure of Nova or that he was deficient in executing his responsibilities at Nova, and instead had and would make clear that Nova had been materially misrepresented to Warburg before Gluck joined Nova.

58.    The defendants knew that was a false representation.

11

Exhibit A

FACTS

1. The deal was not the deal that either WG or Warburg, Pincus had bought into. In a material way, it had been misrepresented. Had you or I had the facts we were entitled to have, we would not have done the deal.

2. The top management organization that developed did not reflect the top management roles that both WG and Warburg, Pincus had intended.

3. WG's conduct in bringing facts to the attention of the board, and of prospective investors, was exemplary throughout. More specifically, Warburg, Pincus has absolutely no complaint with WG about his handling of disclosure issues.

4. The eleventh hour management change that removed WG from his position as COO resulted from circumstances beyond WG's control, and in no way was a reflection on his performance as COO. The circumstances that precipitated the management change could likely have been avoided had WG not been excluded from the process that led up to them. More specifically, there was no basis at Nova to conclude that WG was deficient in executing his responsibilities.

5. In forcing WG from his position as COO, Warburg, Pincus unilaterally broke the deal it had negotiated.


Note: The above draft was reviewed in Fillo's office May 6, 1986, and he expressed general agreement on all points other than point 5, which he said was arguable.

Exhibit B

(212) 878-0600

# E. M. WARBURG, PINCUS & CO., INC.

466 LEXINGTON AVENUE, NEW YORK, N.Y. 10017

WRITER'S DIRECT TELEPHONE
(212) 878-

July 2, 1986

Mr. William D. Gluck
22 Coachman's Run
Avon, Connecticut  06001

Dear Bill,

I appreciate your bringing your concerns to my attention.  It's never too late to set the record straight, particularly after as unfortunate an episode as Nova Robotics.  As one of the company's largest investors, Nova was a costly disappointment for us, as well as for you.  Let me note the following points, so that there can be no doubt as to my views about that company, and your role in it.

As we all now know, Nova's prospects were dim from the outset.  The company's problems apparently were numerous, complex, and deep-rooted.

In no way do we at Warburg, Pincus hold you accountable for the company's failure; I don't know what more you could have done that would have pulled it out of the fire.  You were certainly prompt in bringing the viability issues to the attention of the board, and made a promising start in redirecting the company.  However, no amount of leadership could have overcome the full range of technical deficiencies that emerged.  Only a great deal of time and money, which we all labored long and hard to obtain, could have compensated for them.

The complications of Nova's final weeks put unusual demands on all of us, and especially on you.  You have our appreciation, and I'm sure the appreciation of all Nova investors, for your constructive efforts in an exceptionally difficult situation.

Best wishes in your future endeavors.

Sincerely yours,

Stephen W. Fillo

SWF:mcd

WILLIAM D. GLUCK
22 Coachman's Run
Avon, Connecticut  06001


July 8, 1986

Mr. Stephen W. Fillo
Managing Director
E. M. Warburg, Pincus & Company, Inc.
466 Lexington Avenue
New York, N. Y.  10017

Dear Steve:

Thank you for your letters of July 2.

I am very pleased with the letter setting the record straight.
Reading it in the context of your cover letter, and considering
other possible developments for which you may need to allow, I
appreciate the apparent constraints on what you could say. Where
you've been silent on things we've earlier agreed on, I'll accept
it as just that. Net net, I think it's an excellent statement,
and a gracious gesture on your part.

If the need should ever arise, don't hesitate to call on me to
affirm the factors, rooted in Nova's industry, markets, and
technology, that were the cause of its demise.

For the record, I didn't seek legal counsel in this matter until
you asked for a formal release. I remain willing to exchange
those. But I'm also glad we dropped the topic; I didn't like the
appearance of a quid pro quo.

Please accept my sincere appreciation for the letter. You may be
certain that I consider the matter closed.

Sincerely,

William D. Gluck
WG/tm

EXHIBIT D

## LOST WEALTH COMPUTATION

### ANNUAL CASH COMPENSATION
**Base Salary Plus Bonus, Before Taxes**



Sources of data:

- Undamaged Income Track:
  - 2002 data based on <u>Executive Compensation Survey, 2000</u>, The Conference Board (fifth highest paid executive in a $4 billion manufacturing corporation).
  - 1984 data based on pre-Nova income track through 1982 and loss of one year's income progress
  - Data for intervening years based on constant annual rate of increase (7.8%).
- Actual Income Track is based on federal income tax returns

---

### PRESENT VALUE OF LOST COMPENSATION

| | | **Basis of Computation** |
|---|---|---|
| **Lost Cash Compensation** | **$ 6.0 million** | • Compute annual difference between undamaged career track income and actual income, after tax<br>• Accumulate value to current time at 15% discount rate based on mix of lost life style and lost investment opportunity |
| **Lost Corporate Equity Compensation** | **$11.8 million** | • Corporate award equals $10,000 in 1984 and $740,000 in 2002 (The Conference Board survey). Interpolate in equal annual increments to establish corporate award for intervening years<br>• Effective tax rate equals 20%<br>• Accumulate value to current time based on annual change in S&P 500 total return index |
| **Lost Pension Benefit** | **$ 4.3 million** | • First year's pension income equals 55% of final three years' cash compensation (based on corporate pension benefit practices reported in <u>KPMG SERP Survey, 1999</u>)<br>• Present value of pension benefit based on cost of annuity beginning in year 2003 with 3% annual increase in payment, 50% survivor benefit, computed at 4% discount rate |

®JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)    PLAINTIFFS | DEFENDANTS |
|---|---|
| WILLIAM G. GLUCK | STEPHEN W. FILLO; WARBURG PINCUS LLC; WARBURG PINCUS CAPITAL CORP; and WARBURG PINCUS & CO. |

**(b)** County of Residence of First Listed Plaintiff    MIDDLESEX
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Alexander T. Bok, 35 Melrose Street, Boston, MA 02116
Tel: 617 594 2099.   Fax: 617 249 -0772

Attorneys (If Known)

05  10659 EFH

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1   U.S. Government Plaintiff

☐ 2   U.S. Government Defendant

☐ 3   Federal Question (U.S. Government Not a Party)

☒ 4   Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS —Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1332
Brief description of cause:
Against former employer: Breach of settlement agreement; defamation; tortious interference

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 20,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) ___William D. Gluck v. Stephen W. Fillo___

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐ I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

☐ II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
        740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

☑ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
        315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
        380, 385, 450, 891.

☐ IV.   220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660,
        690, 810, 861-865, 870, 871, 875, 900.

☐ V.    150, 152, 153.

# 05 - 10659 EFH

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
   None.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                          YES ☐    NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)
                                                          YES ☐    NO ☑
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                          YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                          YES ☐    NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                          YES ☑    NO ☐

   A.  If yes, in which division do all of the non-governmental parties reside?
       Eastern Division ☑    Central Division ☐    Western Division ☐

   B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
       Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
                                                          YES ☐    NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  Alexander T. Bok
ADDRESS  35 Melrose Street, Boston, Massachusetts 02116
TELEPHONE NO. 617 594 2099.  Fax: 617 594 2099

(CategoryForm.wpd - 2/15/05)